UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY JO DEJONGHE,

Plaintiff,

v.

CITY OF DEARBORN HEIGHTS, ET AL.,

Defendant.

_____/

Case No. 19-cv-13055

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [#42] AND SETTING NEW
DATES**

## I.   INTRODUCTION

On October 17, 2019, Plaintiff Amy Jo DeJonghe initiated this civil rights

action against Defendants City of Dearborn Heights ("Dearborn Heights" or "The

City") and the City's former Animal Control Officer ("ACO"), Tom Kramarz.  *See*

ECF No. 1.  Plaintiff filed her Amended Complaint on March 24, 2020 alleging that

Defendants violated her rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth

Amendments to the United States Constitution by wrongfully euthanizing Plaintiff's

dog. [1]  *See* ECF No. 18.  Plaintiff also brought claims for conversion and intentional

infliction of emotion distress.  *Id*.

---

[1] Plaintiff also named the Michigan Humane Society ("MHS") as a defendant in
the Complaint and Amended Complaint, but Plaintiff and MHS stipulated to

Presently before the Court is Defendants' joint Motion for Summary Judgment, filed on March 12, 2021.  Plaintiff filed a timely response, *see* ECF No. 43, and Defendants replied, *see* ECF No. 44.  A hearing on this matter was held on October 18, 2021.  For the following reasons the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment [#42].  Specifically, the Court will **GRANT** the motion with respect to all of the claims alleged in Plaintiff's Amended Complaint, except for the Fourth Amendment violation alleged against Defendant Kramarz in Count I.

## II.    FACTUAL BACKGROUND

### A. The Bite Incident

On October 17, 2016, Plaintiff's dog bit a mail carrier.  ECF No. 42-2, PageID.383.  The dog was inside the house watching squirrels through the screen door.  *Id*.  When the mail carrier approached Plaintiff's residence, the dog pushed through the screen door and bit the mail carrier's lower leg.  *Id.*; ECF No. 42-3, PageID.409.  The dog then returned to his crate of his own volition.  ECF No. 42-2, PageID.383.  Plaintiff shut the dog in his crate, and then she returned with a rag to treat the mail carrier's wound.  *Id.* at PageID.383-384.  In the meantime, Plaintiff's neighbor, who had been on her front porch at the time, called 9-1-1.  *Id.*

MHS's dismissal with prejudice, and the Court entered an order of dismissal on May 5, 2020.  *See* ECF No. 22.

at PageID.384.  It took about 15 minutes for Emergency Medical Services ("EMS") to arrive.  *Id.*  During that time, Plaintiff and the mail carrier joked around and made small talk.  *Id*.  The mail carrier affirms that Plaintiff stated she would be putting her dog down.  ECF No. 42-3, PageID.409.

## B. Debriefings with Law Enforcement and Animal Control

Dearborn Heights Police Officer Matt Core arrived before EMS left with the mail carrier.  ECF No. 42-2, PageID.386.  Plaintiff explained what happened and showed Officer Core her dog's license and vaccination records.  *Id.* at PageID.385-86; ECF No. 42-4, PageID.424-25.  Officer Core testified that he thought Plaintiff's dog would go into quarantine because that is normal procedure, ECF No. 42-4, PageID.425, but he could not recall any conversations about the issue, *id.* at PageID.426.

Officer Core was still present when Defendant Kramarz arrived, though they did not speak to each other.  ECF No. 42-2, PageID.387; ECF No. 42-7, PageID.449.  There is some dispute as to what Plaintiff and Kramarz discussed at the scene.  Plaintiff testified that she conversed with Kramarz about her dog needing a ten-day quarantine and whether she would be able to visit the dog during the quarantine.  ECF No. 42-2, PageID.388.  Kramarz told her that she could not visit, but she could call to see how the dog was doing.  *Id*.  He also told her that she might have to pay upwards of $150 per day if the dog needed medical attention.

*Id*.  Additionally, Plaintiff testified that she asked about the process for retrieving her dog, and Kramarz told her she should go to court in ten days.  *Id*.  Plaintiff's boyfriend and neighbor both submitted affidavits stating that they heard Plaintiff discussing the quarantine and potential fees with Kramarz.  ECF No. 43-3, PageID.565; ECF No. 43-2, PageID.560.  Kramarz testified that he did not discuss the quarantine process with Plaintiff.  ECF No. 42-7, PageID.460-61.

Similarly, Plaintiff could not recall whether she discussed her dog's registration or vaccination status with Kramarz because she had already covered that with Officer Core.  ECF No. 42-2, PageID.388.  She was, however, certain she had not given Kramarz copies of the records because she had already given them to Officer Core.  *Id*.  In contrast, Kramarz testified that Plaintiff told him she did not have paperwork for the dog.  ECF No. 42-7, PageID.449, PageID.450, PageID.451.

### C. The Animal Release Form

At some point, Plaintiff's boyfriend helped Kramarz put the dog in the Animal Control truck.  ECF No. 42-2, PageID.388; ECF No. 43-2, PageID.560.[2] After the dog was in the truck, Kramarz filled out the Animal Release Form and presented it to Plaintiff for her signature.  ECF No. 42-7, PageID.448.  Kramarz

---

[2] Kramarz testified that Plaintiff was the person who put the dog in the truck.  ECF No. 42-7, PageID.457

noted in the "remarks" section of the Form that the dog was "aggressive," that he "bit mail lady," that he was "muzzled no longer than 5 minutes," and that he "came from an abusive situation."[3]  *Id.* at PageID.448; ECF No. 42-8, PageID.463.  At the top of the Form, Kramarz checked "bite case" and "owner surrender."  *Id.*

The Director of Ordinance Enforcement and Animal Control testified that the Animal Release Form is a "standard form" from MHS provided to and used by all partnering municipalities.  ECF No. 42-9, PageID.472.  It is a multipurpose form used for all animal dispositions.  *Id.* at PageID.473.  The MHS Facility Director testified similarly.  ECF No. 42-10, PageID.499.  In addition to the "owner surrender" and "bite case" boxes, the Animal Release Form contains boxes for "stray" and "abandonment."  ECF No. 42-8, PageID.463.  Just above the signature line, the bottom of the Form reads

> I am relinquishing ownership of the following described animal(s) to the Municipality listed above.  I understand the animal will be subject to the procedures of this municipality and that this is a final decision. I will not be able to find out what happens to the animal(s) after I surrender them.  I am the owner of this animal and the animal has not bitten anyone within the last 10 days.

*Id.*

---

[3] Plaintiff acquired her dog when he was 4.5 months old from someone who kept him outside, covered in oil, and freezing.  ECF No. 42-2, PageID.382.  There are no allegations that Plaintiff abused her dog.

Plaintiff testified that she believed she signed a different form but admitted that it was her signature on the Animal Release Form.  *Id.* at PageID.389. Specifically, Plaintiff thought she was signing a form that authorized the dog "to be cared for while he was in quarantine in case he got sick, he needed veterinarian care, they had a signature on file to care for him while he was in 10 day quarantine."  *Id.* at PageID.392.  Plaintiff testified that she felt "rushed" when signing even though she did not think she had been pressured into doing so.  ECF No. 42-2, PageID.394.  Plaintiff's neighbor and boyfriend both affirmed that "Kramarz told Plaintiff to sign the form and yanked it away from Plaintiff before she had a chance to read it."  ECF No. 43-3, PageID.566; ECF No. 43-2, PageID.561.  Plaintiff's boyfriend also seemed to indicate that Plaintiff signed the form after the dog had already been placed on the truck.  *See id*.  Plaintiff did not receive a copy of the Animal Release Form at the time of the bite incident.  ECF No. 42-2, PageID.390.

### D. Kramarz Drops the Dog off at MHS

Kramarz could not specifically recall dropping off the dog at the MHS facility.  ECF No. 42-7, PageID.454.  He said that he generally did not stop to talk to the staff and would instead just hand them the Animal Release Form.  *Id*.  He denied directing MHS to euthanize and/or test the dog.  *Id.* at PageID.459.

In contrast, the MHS Facility Director testified that she remembered speaking with Kramarz when he brought the dog in.  ECF No. 42-10, PageID.503. She recalled that he notified the staff that there was "a severely aggressive dog that was signed over by the owner" and "that it needed to be euthanized or tested for rabies, or that it could be euthanized and tested for rabies."  *Id.*  She also noted that Kramarz had brought the dog to the separate euthanasia entrance.  *Id.* at PageID.504.  The Facility Director relayed similar information in an email she sent a few days after the dog was brought in to explain why an attorney was calling the facility.  ECF No. 43-6, PageID.571.  In particular, it stated that the Animal Control Officer who dropped the dog off "confirmed" that the owner "surrendered" the dog and "that it was supposed to be euthanized and tested."  *Id*.

Plaintiff's dog was euthanized by MHS on October 17, 2016, the same day it bit the mail carrier and was brought into the facility.  ECF No. 42-10, PageID.511.

### E.  Days Following the Bite Incident

Plaintiff testified that, the day after the bite incident, she began calling Animal Control to attempt to check on her dog.  ECF No. 42-2, PageID.394.  The phone calls were unsuccessful, so she tried calling the police instead.  *Id*.  The police told her that it was an issue for Animal Control and that they could not discuss the issue with her.  *Id*.  While Plaintiff was running errands, an Animal Control truck drove passed her.  *Id*.  She followed the truck until she could pull in

front of it and got out of her car so she could speak to the Animal Control Officer. *Id*. The Officer was familiar with her case and said that she had probably signed an owner surrender form, but he would check with his boss and get back to her. *Id*. Plaintiff never heard back from that Animal Control Officer.

At some point, Plaintiff learned that her dog had been sent to MHS. *Id*. Someone she spoke to on the phone told her she could call to the facility to check on the dog. *Id*. Plaintiff drove to the MHS facility and "circled" the building "three times looking for [her] dog." *Id*.

Plaintiff appeared in the 20th District Court on October 27, 2016 to respond to the citations from the bite incident and initiate the process of retrieving her dog. *Id.* at PageID.386. Plaintiff learned that her dog had been euthanized from the prosecutor while she was at court. *Id.* at PageID.395.

### III.    LAW & ANALYSIS

#### A. Legal Standard

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). "A fact is material if its resolution will affect the outcome of the lawsuit." *Id*. The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable

to the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255

(1986).  No genuine issue of material fact exists where the record "taken as a

whole could not lead a rational trier of fact to find for the non-moving party."

*Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for the purposes of ruling on a motion for

summary judgment." *Scott v. Harris***,** 550 U.S. 372, 380 (2007).  Ultimately, the

court evaluates "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Anderson*, 477 U.S. at 251–52.

     "[T]he standard that a movant must meet to obtain summary judgment

depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cty.,*

*Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)).  Thus, if the nonmoving party will bear the burden of proof on a

claim, the movant "need only demonstrate that the nonmoving party has failed to

'make a showing sufficient to establish the existence of an essential element' of

that claim." *Id.* (quoting *Celotex*, 477 U.S. at 322).  "[T]o survive a summary-

judgment motion, a plaintiff subject to a preponderance-of-the-evidence burden

must present enough evidence to allow a reasonable juror to conclude that the

[plaintiff's] position *more likely than not* is true." *Id.* (internal quotation marks omitted) (emphasis and alteration in original).

### B. Discussion

#### 1. Count 1: Violation of Plaintiff's Civil Rights Under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments Against Defendant Kramarz

Defendants argue there is no evidence that Kramarz deprived Plaintiff of her constitutional rights, therefore, he is entitled to qualified immunity. Defendants also assert Kramarz is entitled to qualified immunity because there is no clearly established right at issue. ECF No. 42, PageID.360.

Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The court uses a two-step analysis to determine whether an official is entitled to qualified immunity. "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Pearson* v. *Callahan*, 555 U.S. 223, 232 (2009). "Second, if a plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* The burden is on the Plaintiff to present "facts that demonstrate what each

Defendant did violates the asserted constitutional right." *Ondo v. City of Cleveland*, 795 F.3d. 597, 610 (6th Cir. 2015).  But the court must also view the facts in the light most favorable to the Plaintiff.  *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

### i.   There is a Genuine Issue as to Whether a Fourth Amendment Violation Occurred

Defendants advance two arguments to support their assertion that Plaintiff has not alleged a Fourth Amendment violation.  For the following reasons, the Court will deny Defendants' Motion for Summary Judgment as to the Fourth Amendment claims against Defendant Kramarz.

### a.   There Is a Genuine Issue as to Whether the Seizure of the Dog was Unreasonable Under the Fourth Amendment

First, Defendants argue "Plaintiff's surrender of her dog, as evidenced by her signature on the Animal Release Form, precludes any Fourth Amendment violation."  ECF No. 42, PageID.362.  Plaintiff counters that there is at least a genuine issue of material fact as to whether the Animal Release Form reflects consent to surrender her dog or take the dog to a ten-day quarantine.  ECF No. 43, PageID.544.  The Court finds that there is a genuine issue as to the voluntariness of Plaintiff's consent and the scope of any consent given.

The Fourth Amendment protects individuals against unreasonable governmental searches and seizures.  U.S. Const. amend. IV.  "Property that is

voluntarily surrendered is not 'seized' within the meaning of the Fourth Amendment when recovered by law enforcement." *King v. Montgomery Cty., Tennessee*, 797 F. App'x 949, 956 (6th Cir. 2020) (finding that plaintiff's dogs were not seized because she or people she entrusted with their care voluntarily surrendered the dogs to animal control).

> A court determines the degree to which consent is voluntary "under the 'totality of the circumstances, with the government bearing the burden of proof.' The 'government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.'"

*Ghaster v. City of Rocky River*, 913 F. Supp. 2d 443, 464 (N.D. Ohio 2012) (quoting *United States v. McCurdy,* 40 F.3d 1111, 1119 (10th Cir.1994) (citations omitted)).

Defendants rely on *United States v. Young*, 318 F. App'x 407 (6th Cir. 2009), an unpublished opinion, to argue that Plaintiff's consent was valid. In *Young*, federal agents asked the defendant for consent to search his house for drugs, and he verbally consented. *Id.* at 408. He also answered affirmatively when they asked whether he knew firearms were located on the property. *Id.* at 408-09. The agents told the defendant they planned to take him to the house to retrieve the firearm and then bring him before a magistrate judge. *Id.* at 409. They informed his wife of the plan, and then had the defendant fill in a consent form before going

to the house.  *Id*.  When moving to suppress the evidence, the defendant argued,

*inter alia*, that he did not recall verbally consenting or signing the consent form,

although he recognized the signature on the form as his own.  *Id*.  The Sixth Circuit

Court of Appeals upheld the district court's determination that the defendant's

consent was freely and voluntarily given because, *inter alia*, he admitted it was his

signature on the form and remembered a substantial amount of the facts and details

of the event, the situation was nonconfrontational, the defendant was treated fairly,

and the discussion was brief.  *Id.* at 410.

Here, the Court finds that Plaintiff has presented sufficient evidence to allow

a reasonable juror to conclude that it is more likely than not that her constitutional

rights were violated—*i.e.*, there is a genuine issue whether Plaintiff voluntarily

surrendered her dog.  During her deposition, Plaintiff testified that she conversed

with Kramarz about her dog needing a ten-day quarantine and whether she would

be able to visit the dog during the quarantine.  ECF No. 42-2, PageID.388.

Kramarz told her that she could not visit, but she could call to see how the dog was

doing.  *Id*.  He also told her that she might have to pay upwards of $150 per day if

the dog needed medical attention.  *Id*.  Additionally, Plaintiff testified that she

asked about the process for retrieving her dog, and Kramarz told her she should go

to court in ten days.  *Id*.  Plaintiff's boyfriend and neighbor both submitted

affidavits stating that they heard Plaintiff discussing the quarantine and potential fees with Kramarz.  ECF No. 43-3, PageID.565; ECF No. 43-2, PageID.560.

Plaintiff further testified that, in order to attempt to check on her dog, she began calling Animal Control and the police department the day after the bite incident.  ECF No. 42-2, PageID.394.  Because the phone calls were unsuccessful, she went so far as to stop a random Animal Control Officer whom she passed on the street to ask if he knew her dog's status.  *Id*.  She also visited MHS to see if she could catch a glimpse of the dog.  *Id*.

Plaintiff testified that she believed she signed a different form but admitted that it was her signature on the Animal Release Form.  *Id.* at PageID.389. Specifically, Plaintiff thought she was signing a form that authorized the dog "to be cared for while he was in quarantine in case he got sick, he needed veterinarian care, they had a signature on file to care for him while he was in 10 day quarantine."  *Id.* at PageID.392.

Defendants argue, based on testimony from the Director of Animal Control and the MHS Facility Director, that the Animal Release Form is the only form used by Dearborn Heights in these situations.  ECF No. 42, PageID.363.  However, Plaintiff testified that she felt "rushed" when signing.  ECF No. 42-2, PageID.394. Plaintiff's neighbor affirmed that "Kramarz told Plaintiff to sign the form and yanked it away from Plaintiff before she had a chance to read it."  ECF No. 43-3,

PageID.566.  Plaintiff's boyfriend affirmed similarly.  ECF No. 43-2, PageID.561 (Kramarz "told Plaintiff to sign the form and yanked it away from Plaintiff before she had a chance to read it.").  He also seems to indicate that Plaintiff signed the form after the dog had already been placed on the truck.  *See id.*

The Court finds that Plaintiff's situation is different from that of the defendant in *Young*.  In *Young*, there was no discrepancy between the conversation the defendant had with the federal agents, the consent form he signed, and the subsequent actions in which the defendant himself participated.  Here, in contrast, Plaintiff argues that the conversation she had with Kramarz was entirely different from the consent form and the actions taken pursuant to said form.  Moreover, Plaintiff's subsequent actions—repeatedly calling animal control and the police department, stopping a random Animal Control Officer on the street, and visiting MHS—are more consistent with a pet owner who believes they consented to placing their dog in a temporary quarantine than one who has relinquished all their rights to an animal.  A jury, not the Court, should decide whether the totality of the circumstances support Plaintiff's argument that she consented to a quarantine, not a surrender.

Second, Defendants argue that Kramarz's seizure of the dog for transport to MHS was reasonable based on the circumstances facing him at the time, especially in light of a local ordinance that mandates that any animal that bites someone be

quarantined for ten days.  ECF No. 42, PageID.363-64 (citing Dearborn Heights Ordinance § 6-148(a)).  As Plaintiff is not disputing the literal seizure of her dog so much as the idea that she relinquished her rights to the dog rather than granted Kramarz temporary custody for the purpose of putting the dog in quarantine.

### b.  There Is a Genuine Issue as to Whether Kramarz's Actions Violated Plaintiff's Constitutional Rights

Defendants also argue that Plaintiff has failed to show that Kramarz himself violated her constitutional rights.  ECF No. 42, PageID.363.  They argue that "at a minimum, Plaintiff consented to a ten (10)-day quarantine" and therefore "consented to ACO Kramarz taking her dog and transporting him to MHS."  *Id*. "At that point, MHS had the sole discretion in determining the dog's fate."  *Id*.

The Court finds that Plaintiff has presented sufficient evidence that a reasonable juror could conclude that Kramarz's actions played a role in the dog being euthanized.  The Director of Ordinance and Animal Control for Dearborn Heights testified that, absent an owner surrender, the normal procedure in a dog bite case is a ten-day quarantine followed by a court hearing to determine the fate of the dog. ECF No. 42-9, PageID.477.  Kramarz testified that Plaintiff never told him she wanted to surrender the dog, but he felt that it needed to be surrendered because of the severity of the bite.  ECF No. 42-7, PageID.453.  Furthermore, an email sent by the MHS Facility Director a few days after the dog was euthanized stated that the Animal Control Officer who dropped the dog off "confirmed" that the owner

"surrendered" the dog and "that it was supposed to be euthanized and tested."  ECF No. 43-6, PageID.571; *see also* ECF No. 42-10, PageID.504 (MHS Facility Director also testified during her deposition about this conversation).  In contrast, Kramarz testified that he did not direct MHS to euthanize and/or test the dog.  ECF No. 42-7, PageID.459.  He said that he generally did not interact with the MHS staff beyond handing them the Animal Release Form.  *Id.* at PageID.454.  Thus, the Court finds that there is a genuine issue as to whether "what [Kramarz] did violates the asserted constitutional right."  *Ondo*, 795 F.3d. at 610.

### c.  Plaintiff's Property Right in Her Dog Was Clearly Established at the Time

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear' that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and alterations omitted).  There need not be a case directly on point, but the court must determine "whether existing precedent placed the conclusion that [the defendant] acted unreasonably in these circumstances beyond debate."  *Mullenix v. Luna*, 577 U.S. 7, 14 (2015) (internal quotation marks omitted).  Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Sixth Circuit Court of Appeals, along with "every other circuit that has addressed this issue," has held "that a dog is property, and the unreasonable seizure of that property is a violation of the Fourth Amendment." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016). "Every circuit that has considered this issue has concluded that the unreasonable killing of a dog constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Id.* at 567. "[T]his right was clearly established in 2013." *Id*.

Here, Plaintiff had a clearly established right to not have her dog unreasonably killed. This right has been clearly established since at least 2013 when *Brown* was decided. Defendants again argue that property that is voluntarily surrendered cannot be "seized" within the meaning of the Fourth Amendment. ECF No. 42, PageID.365-66. However, for the reasons discussed *supra*, the Court finds there is a genuine issue as to whether Plaintiff voluntarily surrendered her dog to be euthanized.

### ii. There Is a Genuine Issue as to Whether a Fourteenth Amendment Violation Occurred

Defendants advance two arguments challenging Plaintiff's Fourteenth Amendment claims against Kramarz. For the following reasons, the Court finds that, while there is a genuine issue whether Plaintiff was entitled to a pre-deprivation hearing, Kramarz is entitled to qualified immunity on this claim. Thus,

18

the Court will grant Defendants' Motion for Summary Judgment as to the

Fourteenth Amendment claim against Defendant Kramarz.

### a.  There Is a Genuine Issue as to Whether Plaintiff Was Entitled to Pre-Deprivation Hearing

The fundamental requirement of due process is notice and the opportunity to

be heard at a meaningful time and in a meaningful manner.  *Armstrong v. Manzo*,

380 U.S. 545, 552 (1965).  To establish a violation of her due process rights under

the Fourteenth Amendment, Plaintiff must prove "(1) a life, liberty, or property

interest requiring protection under the Due Process Clause, and (2) a deprivation of

that interest (3) without adequate process."  *Fields v. Henry County*, 701 F.3d

180,185 (6th Cir. 2012).  Generally, "due process ordinarily requires an

opportunity for "some kind of hearing" prior to the deprivation of a significant

property interest."  *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452

U.S. 264, 299 (1981); *see also O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662

F.3d 723, 733 (6th Cir. 2011) ("Due process requires notice of the charges and a

meaningful opportunity to contest the evidence.").  "There are, however,

extraordinary situations where some valid governmental interest is at stake that

justifies postponing the hearing until after" the deprivation.  *Flatford v. City of

Monroe*, 17 F.3d 162, 167 (6th Cir. 1994).  These include "[p]rotection of the

health and safety of the public[,] which is "a paramount governmental interest."

*Hodel*, 452 U.S. at 300.

First, Defendants argue that Plaintiff was not entitled to a pre-deprivation

hearing under local law and because of "the strong government interests at issue."

ECF No. 42, PageID.366.  In particular, Defendants argue that Kramarz properly

seized Plaintiff's dog pursuant to Ordinance § 6-148(a).  *Id*.  Again, the Court finds

that Defendants mischaracterize Plaintiff's argument.  Plaintiff challenges the

permanent deprivation that resulted from her dog being euthanized, not the idea

that her dog needed to be quarantined.

Moreover, Defendants' reliance on Ordinance § 6-148(a) appears misplaced.

The Ordinance provides

> Any person who shall have in his possession an animal which . . . has
> bitten any person shall, upon demand of the animal warden or any
> police officer, produce and surrender the animal for observation for a
> period of ten (10) days.  Before any animal impounded by reason of
> the foregoing provision shall be released, the owner shall be required
> to pay a fee for each day the animal is impounded, which fee shall be
> specified by council resolution.

The Ordinance gives explicit permission to take a dog that has bitten someone and

hold it for ten days.  It does not provide for the euthanizing of the dog.  The City of

Dearborn Heights has chosen, through this Ordinance, to "protect[] the health and

safety of the public, *Hodel*, 452 U.S. at 300, by holding dogs that bite people for

ten days to determine whether they are rabid.  Defendants have not explained why,

20

as a matter of law, this was one of the "extraordinary situations where some valid governmental interest . . . justifie[d] postponing the hearing" until after the deprivation.   *Flatford*, 17 F.3d at 167.  Thus, the Court finds there is, at least, a genuine issue as to whether Plaintiff was entitled to a pre-deprivation hearing.

### b.  Kramarz Is Nonetheless Entitled to Qualified Immunity Because Plaintiff Has Not Demonstrated that State Law Remedies Would Be Inadequate

Second, Defendants argue that because Plaintiff is alleging a "one-off instance of purported misconduct," she must demonstrate the inadequacy of state law remedies, which she has failed to do. ECF No. 42, PageID.367 (citing *King*, 797 F. App'x at 956).  Plaintiff did not address this argument in her response brief. *See generally* ECF No. 43, PageID.555 (arguing that Plaintiff had a property interest in her dog, she was deprived of that interest when the dog was euthanized, and Defendants did not afford Plaintiff the opportunity to contest the destruction of her dog).

At the hearing on this motion, Plaintiff's Council cited to *Moreno v. Hughes*, 157 F. Supp. 3d 687 (E.D. Mich. 2016) to argue that state law remedies are inadequate.  In *Moreno*, this Court held that federal, not state, common law governs the determination of damages in § 1983 actions, so the plaintiffs' compensatory damage award for the unlawful shooting of their dog in violation of

the Fourth Amendment could include mental and emotional distress damages, even though state law did not allow such recovery.  157 F. Supp. 3d at 690.

"In the Sixth Circuit, 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Nationwide Prop. & Cas. Ins. Co. v. Brown*, 260 F. Supp. 3d 864, 879 (E.D. Mich. 2017) (quoting *Meridia Prod. Liab. Litig. v. Abbott Laboratories*, 447 F.3d 861, 868 (6th Cir. 2006)).  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).  Here, Plaintiff did not challenge the adequacy of her potential state law remedies in her response brief; instead, Plaintiff's counsel addressed them at oral argument "in the most skeletal way" without explanation as to why the Court should extrapolate its holding from the narrow damages issue before it in *Moreno* to the current issue of whether Kramarz is entitled to qualified immunity.  Because the Court cannot develop Plaintiff's arguments *sua sponte*, Plaintiff's challenge is waived.

Even if Plaintiff's argument was not waived, her Fourteenth Amendment claim would still fail.  "Deprivations that result from concrete governmental policies require a more demanding due process inquiry." *King*, 797 F. App'x at 957 (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981) (overruled on other grounds); *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 613–14 (6th Cir. 2015)).  When the

plaintiff alleges an "irregular circumstance, one driven more by human error than by adherence to a flawed governmental policy," the "plaintiff must demonstrate that the state in which the error occurred . . . affords no adequate remedy." *Id.* (citing *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 909–10 (6th Cir. 2014)). Where the plaintiff does not meet that burden, the claim must fail. *Id*.

Here, Plaintiff has not demonstrated that Michigan does not provide an adequate remedy for her deprivation. Indeed, Plaintiff's complaint includes state law claims for conversion (Count III) and intentional infliction of emotional distress (Count IV). ECF No. 18, PageID.144-45. Ironically, conversion is one of the claims the Sixth Circuit Court of Appeals recommends in *King*. *King*, 797 F. App'x at 957 ("She has not shown why, for instance, she could not have pursued a state-law conversion claim . . . .") By bringing the conversion and intentional infliction of emotional distress claims, Plaintiff demonstrated that, at least when filing her complaint, she believed the state law remedies were adequate. Therefore, Defendant Kramarz is entitled to qualified immunity on Plaintiff's Fourteenth Amendment claim.

### 2.  Plaintiff Conceded Counts II-IV

In her Amended Complaint, Plaintiff alleged "Four Theories of Municipal Liability" against Dearborn Heights, s*ee* ECF No. 18, PageID.142-44, a conversion claim, *id.* at PageID.144, and a claim for intentional infliction of emotional

distress, *id.* at PageID.145.  Defendants challenged each of these theories in turn.

*See* ECF No. 42, PageID.368-74.  However, Plaintiff did not mention these

arguments, any of her theories of municipal liability, or either of her state law

claims in her response motion.  *See generally* ECF No. 43.  At the hearing on the

motion, Plaintiff's counsel conceded that Plaintiff has waived these claims after

determining they were not supported by discovery.   Thus, the Court will grant

Defendants' summary judgment motion with respect to the remaining counts.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, the Court will **GRANT IN**

**PART AND DENY IN PART** Defendants Motion for Summary Judgment [#42].

Specifically, the Court will **GRANT** the motion with respect to all of the claims

alleged in Plaintiff's Amended Complaint, except for the Fourth Amendment

violation alleged against Defendant Kramarz in Count I.

The following dates shall govern in this matter:

Facilitation/Mediation:[4]          November of 2021

---

[4] The parties shall submit the case to facilitation. A proposed stipulated order referring case to facilitation shall be submitted to the Court via the utilities function on CM/ECF no later than October 26, 2021. The proposed order must identify the facilitator and the date set for facilitation.  Facilitation must occur no later than November 30, 2021.

Motions *in Limine* cutoff:          December 6, 2021

Joint Final Pretrial Order:          December 30, 2021

Final Pretrial Conference:          January 5, 2022 at 2:00 p.m.

Trial date:                          January 18, 2022 at 9:00 a.m.

The practices and procedures set forth in this Court's July 15, 2020

Scheduling Order shall remain in effect.  ECF No. 26, PageID.293-98.

**IT IS SO ORDERED.**


s/Gershwin A. Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  October 20, 2021


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
October 20, 2021, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager